# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP  DIVISION

| | | |
|---|---|---|
| **METAMINING, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:12CV00024 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **WILLIAM DAVID BARNETTE,** | ) | By:  James P. Jones |
| **ET AL.,** | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Eric R. Thiessen, McElroy, Hodges, Caldwell & Thiessen, Abingdon, Virginia, for Plaintiff; Stephen M. Hodges and Seth M. Land, Penn, Stuart & Eskridge, Abingdon, Virginia, for Defendants.*

In advance of a jury trial in this civil case, the parties have filed cross motions for partial summary judgment, as well as objections to proposed evidence. The motions and objections have been fully briefed and orally argued and are resolved in this Opinion.


## I.  Background.[1]

This case results from a transaction in which a coal mining business in Virginia was sold to the plaintiff, Metamining, Inc. ("Metamining"), a California corporation, for the sum of $5 million.  The president of Metamining is Ling Li, a

---

[1]  The facts are taken from the Complaint and the summary judgment record submitted by the parties.

resident of California. It is owned by Li and Song Chen, a Chinese national. Prior to the transaction, Metamining had little or no experience in coal mining in the United States.

As a result of the sale, Metamining obtained the ownership of Barnette Energy, LLC ("Barnette Energy"), a Virginia limited liability company, from its sole members, William David Barnette ("David Barnette") and his wife, Arlene V. Barnette ("Arlene Barnette"). Barnette Energy operated a surface coal mine at Mill Creek, in Dickenson County, Virginia, as well as a combined rock quarry and surface coal mine in nearby Tarpon. A written Sales Agreement, dated August 25, 2010, is at the center of the present controversy.[2] This agreement, prepared by an attorney for the sellers (not sellers' present counsel, I must add), is a model of impreciseness and ambiguity. Doubtless in light of these defects, it has spawned numerous disagreements between the parties about its meanings.

In the Complaint, filed two years after the Sales Agreement, Metamining claims breach of contract, fraud, and fraud in the inducement.[3] The defendants named are the Barnettes and Barnette Construction, Inc., an entity allegedly

---

[2] A copy of the Sales Agreement is attached as Exhibit 2 to the Complaint. The parties to the agreement are Mr. and Mrs. Barnette and Barnette Energy, as sellers, and Metamining as purchaser.

[3] The defendants have asserted a Counterclaim, but it is not involved in the present motions.

controlled by David Barnette.  Jurisdiction of this court is based upon diversity of citizenship and amount in controversy.[4]  28 U.S.C.A. § 1332 (West 2006).

## II. Plaintiff's Motion for Partial
## Summary Judgment.

Metamining seeks summary judgment on certain breach of contract claims as to certain assets to be held by Barnette Energy following the transfer of ownership, as well as contractual indemnity for certain undisclosed liabilities of Barnette Energy.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this diversity case, I must apply the substantive law of

---

[4]  One of the defects in the Sales Agreement is that it combines the normal terms of an asset purchase with that of a "stock" or ownership purchase.  For example, in its habendum clause it describes an asset to be transferred as Barnette Energy itself, along with specific assets possessed or owned by Barnette Energy.  Nevertheless, it appears clear from this record that what was intended was that Metamining would purchase from the Barnettes the ownership of Barnette Energy, and that representations were also made in the Sales Agreement concerning the assets owned by Barnette Energy that were to remain with it after the transfer of that ownership.  Barnette Energy is not a party to the present case, even though it survived the transfer in ownership and it suffered the contract damages claimed rather than its new owner, Metamining.  *See RBA Capital, LP v. Anonick*, No. 3:08cv495, 2009 WL 960090, at *2 (E.D. Va. Apr. 8, 2009) ("Shareholders or members lack standing where injury to them is merely derivative of the injury to the corporation.").  The defendants suggest that Barnette Energy was not added as a plaintiff because it would have destroyed diversity and thus foreclosed a federal court forum for this case.  Metamining contends that it has standing to sue for Barnette Energy's damages because of an indemnity provision in the Sales Agreement.  I will await the evidence at trial to determine this issue, if necessary.

Virginia, the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938). Normally, the plain language of a written contract controls. *See Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 194 (Va. 1984). However, where the language of the contract taken as a whole is ambiguous and open to more than one interpretation, the court may permit extrinsic evidence to prove its meaning. *See Amos v. Cofffey*, 320 S.E.2d 335, 337 (Va. 1984). The mere fact that the parties disagree as to the meaning of the contract language is not sufficient to show ambiguity, *id.*, and moreover, "contractual provisions are construed strictly against their author," *Am. Realty Trust v. Chase Manhattan Bank*, 281 S.E.2d 825, 831 (Va. 1981). Nevertheless, I find that in this case the language of the Sales Agreement is ambiguous in important respects and the proper construction of the contractual terms at issue must await the trial.

For example, the Sales Agreement lists as one of the "Assets to be Transferred" the following, in its entirety:

Barnette Energy, LLC mining **Permit # 1101978** is located on the 4,000 acre tract per Deed Book 11, page 16 (or 116) and here referenced at the following Latitude and Longitude locations:

| Corner | Latitude | Longitude |
|--------|----------|-----------|
| Northwest | 37 11' 49" | 82 21' 35" |
| Southwest | 37 09' 01" | 82 19' 46" |
| Northeast | 37 11' 59" | 82 20' 51" |
| Southeast | 37 09' 34" | 82 18' 49" |

(Sales Agreement ¶ III(3) (emphasis in original).)

Metamining contends that the plain meaning of this contractual term is that after the sale, Barnette Energy was to own a surface coal mine lease of 4,000 acres. Instead, it contends, the actual acreage is 1,921. In response, the defendants argue that the contractual obligation is only to transfer a specified mining permit and that in any event, Metamining was provided in connection with the Sales Agreement a document, referred to by the parties as the "Reserve Estimate" that shows that the Barnette Energy's surface coal mine was located on a 1,900-acre tract.[5] Moreover, the defendants assert that the metes and bounds description in the deed referred to plots out to 1,921 acres.

I find that there is a genuine dispute of a material issue of fact as to the meaning of this contractual obligation. The language of the contract states that the mining permit in question is "located on" the referenced 4,000 acre tract, not composed of 4,000 acres. Even if the other references cited by the defendants show that the mining permit covered less than that, the plain language of the agreement, without extrinsic proof, could not support summary judgment.

I similarly find that issues of fact exist as to the remaining claims by the plaintiff involving other assets that are grounded upon the same "4,000 acre tract" language.

---

[5] The Reserve Estimate was prepared by Barnette Energy's engineering firm, Terra Tech Engineering Services.

The plaintiff also moves for summary judgment on another asset described in the Sales Agreement, described variously by the parties as the Raising Kane, Billie Branham, or Big Ridge property. The Sales Agreement described this asset as follows:

> The Barnette Energy, LLC/Raising Kane, LLC lease aka the Branham property is located on their 1,042 acre tract per Deed Book 11, page 126, Dickenson County Clerk's Office, Clintwood, Virginia and here referenced at the following Latitude and Longitude locations:

| Corner | Latitude | Longitude |
|--------|----------|-----------|
| Northwest | 37 13' 47" | 82 20' 27" |
| Southwest | 37 13' 20" | 82 19' 54" |
| Northeast | 37 14' 30" | 82 19' 17" |
| Southeast | 37 13' 41" | 82 18' 51" |

(Sales Agreement ¶ III(7).) While it appears that there is no lease from Raising Kane, LLC ("Raising Kane"), to Barnette Energy, there is a document entitled "Surface Rights Agreement" from Raising Kane to Barnette Construction, Inc. (not Barnette Energy), which agreement purports to permit the use of the surface of the Branham property for coal mining. Metamining contends that the description in the Sales Agreement of this asset was untrue because Raising Kane did not own the property. Accordingly, Metamining claims that "[t]he Barnettes' silence about Raising Kane's dubious ownership of the property leased was a clear breach of their warranty under the Sales Agreement that all 'information contained in this

sales agreement and documents attached or appended there unto are true and accurate to the best of the SELLER'S knowledge.'" (Pl.'s Mem. 30.)

I agree with the defendants that there are genuine issues of material fact that preclude summary judgment on this claim. For one thing, the defendants dispute that they knew that Raising Kane did not have the power to enter into the Surface Rights Agreement, even assuming that it did not.

In the Sales Agreement, the sellers warranted "that Barnette Energy, LLC is free of debts and liabilities and lawsuits." (Sales Agreement ¶ IV(4).) Metamining claims that there were debts and liabilities and seeks recovery for breach of this warranty. In particular, Metamining asserts there were (1) reclamation liabilities; (2) a claim by a property owner named Arlene Deel, and (3) regulatory violations for mining off-permit.[6]

The alleged reclamation liabilities compose the largest claim. In fact, Metamining asserts that the cost of reclamation at Barnette Energy's Mill Creek Mine existing as of the sale "exceeded the value of the existing permitted and proven coal reserves remaining at the mine." (Pl.'s Mem. 15.) In support of this claim, Metamining also relies on another provision of the Sales Agreement that provides that "SELLER agrees to indemnify and hold harmless the PURCHASER, its subsidiaries and affiliates for any actions and/or inactions by SELLER

---

[6] The plaintiff also contends that there were other liabilities, but does not seek summary judgment as to those claims. (Pl.'s Mem. 30 n.1.)

regarding its permitted coal mining and stone quarry operations which have occurred in, around or upon the leased and permitted operations on or prior to the date of closing of this transaction." (Sales Agreement ¶ VIII(1).)

The defendants deny that the Sales Agreement provided that they pay for the purchaser's reclamation costs, particularly when viewing the agreement as a whole. They point out that the Sales Agreement provides that "[t]here is no warranty either expressed or implied, by the SELLER to PURCHASER regarding the permitted coal mining or quarry operations being transferred herein." (Sales Agreement VIII(3).) They cite part VII of the Sales Agreement, which contains specific obligations regarding reclamation, including that purchaser must "adhere to all applicable state and federal mining and reclamation laws and timely pursue and correct any violations assessed against the permits transferred herein during any period after the closing wherein SELLER and/or William David Barnette is listed as responsible operator and/or prior to SELLER'S and/or Barnette's bonds being released." (Sales Agreement ¶ VII(2).) The defendants assert that they are prepared to introduce testimony showing that the intent of the parties was that Barnette Energy was not to reclaim the property sold, in order to allow Metamining to engage in further mining.

In light of the apparent inconsistencies in the provisions of the contract and the resulting ambiguity, I find that there are disputed issues of fact as to this claim and will deny summary judgment.[7]

As to the claimed Arlene Deel liability, it appears that Deel did file suit against Barnette Energy after the sale, and eventually obtained a judgment for coal mined from her property, but the defendants dispute that any alleged mining occurred prior to the closing and that it was not until after the sale that Deel made her claim as to a specific tract of land. In regard to the alleged regulatory violations, it appears that prior to the sale, Barnette Energy was cited by the Virginia Department of Mines, Minerals and Energy ("DMME") with notices of violation for mining on neighboring property owned by Ronnie Branscome. Barnette Energy contested the violations and won initially before a hearing officer on March 31, 2011. On May 6, 2011, the deputy director of DMME overruled the hearing officer, and Barnette Energy timely noted an appeal on June 10, 2011, to the local circuit court, but failed to perfect the appeal by filing a petition within 30 days of noting the appeal. *See* Va. Sup. Ct. R. 2A:4(a). Thereafter, in 2012, before this suit was filed, the new owner settled the matter with DMME. Pursuant to the

---

[7] The plaintiff has filed a motion seeking to strike two affidavits filed in response to this aspect of the plaintiff's Motion for Partial Summary Judgment on the ground that the opinions as to the costs of reclamation set forth in the affidavits are unsubstantiated. However, since I have not relied on those affidavits in determining the summary judgment motion, I will deny the motion to strike.

Settlement Agreement, Barnette Energy was required to remediate the damage to the Branscome property, which the plaintiff asserts cost it over $40,000, with other costs to come.

I find that there are disputed issues of fact as to the Arlene Deel matter, requiring resolution at trial. As to the DMME violations, those do appear to be covered within the scope of the indemnity provisions of the Sales Agreement, but I find it necessary for the plaintiff to show the reasonableness of the remediation agreed to by it in the Settlement Agreement with DMME. While the new owner may not have had much choice but to reach an accommodation with the state agency, the terms of that accommodation are matters left to the plaintiff's proof at trial.

For all of these reasons, partial summary judgment for the plaintiff will be denied.

### III. Defendants' Motion for Partial Summary Judgment.

The defendants have moved for partial summary judgment on certain of the claims made by Metamining in its pretrial disclosures for specific amounts of compensatory damages. According to the defendants, there is no evidence that the plaintiff has suffered monetary damages as a result of any of the circumstances surrounding these claims.

The claims in question are as follows: (1) the claim for damages resulting from the so-called Raising Kane lease, including (2) damages associated with Metamining's preparation to mine that property; (3) lost profits at the Mill Creek mine; (4) funds withdrawn after the sale from a Barnette Energy checking account; (5) insurance premiums paid after the sale covering the sellers; and (6) any tax liabilities of Barnette Energy left remaining after the sale. In addition, the defendants seek summary judgment as to any claim for fraud against Arlene Barnette and any claim for fraud or breach of contract against Barnette Construction, Inc. I will discuss these claims seriatim.

As earlier explained, one of the assets described in the Sales Agreement is "The Barnette Energy, LLC/Raising Kane, LLC lease aka the Branham property . . . located on their 1,042 acre tract . . . ." (Sales Agreement ¶ III(7).) Metamining claims that it believed that this represented a "major asset" to be obtained in the transaction on the ground that the property in question (also known as Big Ridge) contained a large quantity of minable coal. (Pl.s' Mem. in Opp'n 2.) As Charles Merchant, Metamining's agent, testified in his deposition, "We counted big time on Big Ridge, that was to be our future." (Merchant Dep. 98.)

Metamining contends that representatives of Barnette Energy assured it of the important value of this property, including, for example, in the Reserve Estimate prepared by Barnette Energy's mining engineer, formally entitled

"Estimated Remaining Reserve – Barnette Energy, LLC Properties," and made part of the Sales Agreement. The Reserve Estimate describes the property as "Big Ridge Operation – Billie Braham [sic] Lease." (Reserve Estimate 2.) The Reserve Estimate recites the royalty rates for the coal, both surface and underground, and states, "The Billie Branham lease properties consist of various tracts recorded under Raising Kane, LLC which lie on the watershed of Cane and White Branch of Big Ridge in Dickenson County." (Reserve Estimate 3.)

In fact, as noted previously, the Raising Kane agreement does not lease any coal. While it purports to license surface rights in order to mine coal, it does not lease any of the coal itself, as is clear from a careful reading of the document. While Merchant has testified that he tried to read it, no one else with Metamining did, and Metamining claims that it did not benefit from any legal assistance at all during the entire transaction.

The defendants contend that Metamining has suffered no damages from the Raising Kane representations, since post-sale Barnette Energy leased the underground coal on the property, for which it does not need what was purportedly conveyed in the Raising Kane agreement. Moreover, the defendants contend that it was unreasonable for Metamining to rely on any representations made about this property, in light of the actual Raising Kane document.

It appears to be undisputed that as of March 1, 2011, following the sale, and prior to this lawsuit, Barnette Energy obtained a lease of the coal reserves attributable to this property from Steinman Development Company, the owner of the coal. The plaintiff does not contend that there is any material difference in the royalty rate or other expense that it must pay for the coal under this current lease from that which it anticipated based upon the defendants' representations. According to the defendants, Metamining has now received, at no claimed extra cost, all that was represented to it by the sellers. Barnette Energy can now mine if it wishes the estimated 4.4 million tons of coal at Big Ridge, just as Metamining expected it to be able to when it bought Barnette Energy.

On the other hand, the plaintiff argues that this different lease is irrelevant because it would not have paid the sellers as much for the business as it did if it had known that it was actually receiving nothing from the false representations that Barnette Energy had an existing lease for the coal reserves in question. (Pl.'s Mem. in Opp'n 15-16.) In other words, it claims that it paid an inflated purchase price for the business because of the misrepresentation by the defendants. But the present record does not contain evidence by which a jury could reasonably determine what amount, if any, Metamining paid based upon the alleged representation concerning the Raising Kane lease. After all, Barnette Energy owned other assets, including operating coal mines at Mill Creek and Tarpon.

Metamining also claims that the Steinman lease does not provide it "all" of the mining rights that it expected under the defendants' representations. (Pl.'s Mem. in Opp'n 16.) It is true that Barnette Energy has only the right under the Steinman lease to take coal from the property under the deep mining method. But Metamining does not contend that it has suffered any harm in that regard. In fact, the Reserve Estimate upon which it says it relied estimates only coal tonnage from deep mineable seams.

Damage to the injured party is a prerequisite to a fraud claim. *Murray v. Hadid*, 385 S.E.2d 898, 903-04 (Va. 1989). I find that Metamining is unable to prove any such damages as a result of the alleged misrepresentation as to the Raising Kane property and will enter summary judgment for the defendants as to the claim.

I also find that Metamining cannot prove that its reliance upon the representations of the defendants as to this property was reasonably justified, in light of the clear language of the Surface Rights Agreement, which Charles Merchant, Metamining's agent, claims he read and which was available to Metamining's principals. *See Harris v. Dunham,* 127 S.E.2d 65, 72 (Va. 1962). As an excuse, Metamining asserts that it was told that it had only 19 working days for due diligence, since David Barnette was threatening to sell to someone else, but not only was that sufficient time to have had this important document carefully

examined by a competent advisor, Metamining was free to refuse to purchase the business unless and until it had conducted a prudent investigation.

The breach of contract claim by Metamining regarding the Raising Kane property stands on a somewhat different footing. Damages are not an element of the cause of action. 24 Richard A. Lord, *Williston on Contracts* § 64:6 (4th ed. 2002) ("An unexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury."). Where there are no damages, the action may proceed even though only nominal damages can be awarded. Metamining was under a duty to avoid any damages resulting from breach of contract, *see id.* § 64:27, and it appearing that it has so mitigated such damages, I will enter summary judgment for the defendants as to compensatory damages but allow Metamining to proceed with its breach of contract claim, which, if proved, would entitled it to nominal damages only.

The defendants object to any evidence that Barnette Energy suffered lost profits from its Mill Creek operations following the sale. While I agree with the defendants that evidence of lost profits may be speculative, it appears that the lost profit claim is based upon the contention that the defendants breached their contractual obligation with respect to reclamation liabilities. Accordingly, I will not grant summary judgment as to this claim, although it appears that the plaintiff

could not recover for both the costs of reclamation and any lost profits resulting from such costs.

I hold that defendant Arlene Barnette is entitled to summary judgment on any claim against her for commission of fraud. This claim is based solely on her alleged vicarious liability, but I find that there is no evidence in the present record of her relationship with others that would create such a liability. She was David Barnette's spouse and was an owner of Barnette Energy, but I know of no legal principle that would thus make her liable based on this status.[8]

I also have determined that there is no actionable claim in this case against Barnette Construction, Inc. It is a separate entity, and there is no evidence that David Barnette, an officer of Barnette Construction, Inc., performed in that capacity in connection with any of his actionable conduct.

Finally, I find that there are genuine issues of fact as to the insurance, bank account, and tax liability claims by Metamining and will deny summary judgment as to those issues.

---

[8] Arlene Barnette will remain a defendant as to the contract claims. While it is argued that she signed the Sales Agreement only in a representative capacity, I find that a proper interpretation of that agreement is that she was an individual party to it. Otherwise, it would not have been possible to have transferred her interest in the limited liability company.

## IV. Defendants' Motion to Strike Plaintiff's
## Fourth and Fifth Supplemental
## Initial Disclosures.

The defendants have moved to exclude new witnesses disclosed by the plaintiff in its Fourth and Fifth Supplemental Initial Disclosures, filed on the day of and the day before the discovery cutoff date.

The proper analysis of such a motion is as follows:

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires that a party must provide to its opponent, *without awaiting a discovery request,* the name of each individual likely to have discoverable information that the disclosing party may use to support its claims, unless the use would be solely for impeachment. Fed. R. Civ. P. 26(a)(1)(A)(i). These initial disclosures must be made within fourteen days of the parties' first discovery planning conference. Fed. R. Civ. P. 26(a)(1)(C). In addition, Rule 26(e)(1)(A) requires that a party *must supplement* or correct these initial disclosures *in a timely manner,* if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. Fed. R. Civ. P. 26(e)(1)(A).

If a party fails to identify a person as required by Rules 26(a) or 26(e), that party is not permitted to call that person as a witness at trial unless such failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The basic purpose of this exclusionary rule is to prevent "surprise and prejudice to the opposing party." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.,* 318 F.3d 592, 596 (4th Cir.2003). It is not necessary that the nondisclosure be in "bad faith or callous disregard of the discovery rules" for the evidence to be excluded. *Id.* The burden is on the nondisclosing party to show harmlessness or justification. *See id.* When assessing whether the nondisclosure was substantially justified or harmless, the court, in its broad discretion, should consider "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to

cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* at 597.

*Quesenberry v. Volvo Grp. N. Am., Inc.,* 267 F.R.D. 475, 478 (W.D. Va. 2010).

According to the plaintiff, a number of the new witnesses are designated merely to authenticate documents earlier disclosed. While I will not exclude those authenticating witnesses, I urge the parties to seek to agree as to the authenticity of the documents, in order to avoid unnecessary trial time.

Three witnesses are apparently substantive: Arlene Deel, Thomas Shilling, and Roger Viers. The plaintiff asserts that these witnesses were "well-known" to the defendants and thus they will not be prejudiced by allowing them to testify. The defendants respond that despite their knowledge of the witnesses, they did not know that they had knowledge useful to the plaintiff in proving its claims and are thus prejudiced by their inability to depose them.

Based upon my consideration of the relevant factors cited above, I will allow witness Arlene Deel. That witness has been at the center of one of the plaintiff's claims and I accept the plaintiff's explanation of the recently developed testimony that produced the need for her testimony. On the other hand, I will exclude witnesses Shilling and Deel. No appropriate explanation has been given for the failure to disclose these witnesses earlier, nor has the overbalancing need for their testimony been shown. While an alternative to exclusion would be to allow the

defendants to depose these witnesses at this late date, in light of the vagueness of explanation of their expected testimony and the burden depositions would place on defendants' last-minute trial preparations, I decline to exercise my discretion in that regard.

V. Defendants' Objections to the Testimony
of Plaintiff's Designated Expert Witness
Roger Daugherty.

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Metamining has disclosed Roger Daugherty of Pikeville, Kentucky, as an expert whose testimony it anticipates presenting at trial. Daugherty gives opinions as to the value of the assets owned by Barnette Energy at the time of the sale. In addition, he states his opinion about Barnette Energy's costs of reclamation.[9]

Daugherty is well-credentialed. He holds a Bachelor of Science degree in mining engineering and has worked for coal companies in positions ranging from

---

[9] Daugherty's written expert's report is dated March 22, 2013 (ECF No. 104-1), and is supplemented by an addendum dated April 18, 2013 (ECF No. 104-2). The defendants initially objected to the addendum as untimely but have now withdrawn that objection. Daugherty was also deposed by the defendants on April 5, 2013, and the full transcript of that deposition is part of the record. (ECF No. 122) At the hearing on the defendants' objection to Daugherty's testimony, the plaintiff did not propose any further evidence for the court to consider prior to trial to determine the admissibility of the opinions at issue. While courts sometimes conduct pretrial evidentiary hearings in order to determine the admissibility of expert opinions, that is within the court's discretion. *See In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138 (9th Cir. 2002). Particularly since counsel for the plaintiff is unable to specify any additions to Daugherty's opinions not contained in his report, its addendum, or in his deposition, I find that no further evidence is necessary.

miner, to operations manager, to president and owner. He is certified as an appraiser by both the Equipment Appraisers Association of North America and the Certified Appraisers Guild of America. Daugherty has made numerous prior appraisals in the coal industry.

The defendants have objected to Daugherty's qualifications as an expert for the purposes of appraising mineral interests, as well as to the substance of the opinions he expresses. They first contend that because Daugherty is not a licensed real estate appraiser, he is not qualified to offer an opinion as to the value of leases and permits to mine coal. Second, they argue that his opinions with regard to the value of the coal property should be excluded because they are not based on sufficient facts or data and are not the product of reliable principles and methods. Finally, the defendants argue that Daugherty's opinion regarding the costs of reclamation to Barnette Energy is not based on sufficient facts or data and for that reason should also be excluded.

The defendants seek to exclude the plaintiff's expert witness under Federal Rule of Evidence 702. This rule allows parties to introduce expert testimony under certain circumstances:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court interpreted this rule as placing the court in a "gatekeeping role" between expert evidence and the trier of fact. 509 U.S. 579, 589, 597 (1993). Accordingly, the court is tasked with determining whether the proponent has established by a preponderance of the evidence that the expert's opinion is admissible. *See id.* at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)); Fed. R. Evid. 104(a).

To make this determination, *Daubert* suggests that the trial court examine the evidence's reliability and relevance using a number of nonexclusive factors. *Daubert*, 509 U.S. at 593-95. A trial court may consider "(1) whether the particular scientific theory 'can be (and has been) tested'; (2) whether the theory 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error'; (4) the existence and maintenance of standards controlling the

technique's operation'; and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community." *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593-94). *Daubert* applies to all forms of expert evidence, including technical and "other specialized knowledge" and trial courts have "considerable leeway" in determining the admissibility of such evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999). The proponent of the expert bears the burden of demonstrating the admissibility of the expert's testimony "by a preponderance of proof." *Daubert*, 509 U.S. at 592 n.10.

The defendants first argue that Daugherty's testimony is not admissible under Rule 702 because he is not, in fact, an expert qualified to give an opinion about the value of property interests in coal. The defendants cite a decision from the Virginia Supreme Court concluding that an expert must be a licensed real estate appraiser before being allowed to testify in any court proceeding in Virginia about real property values. *See Lee Gardens Arlington Ltd. P'Ship v. Arlington Cnty Bd.*, 463 S.E.2d 646, 649-650 (Va. 1995).

This argument runs into two obstacles. First, subsequent to the *Lee Gardens* decision, the Virginia General Assembly adopted a statutory amendment that specifically preserves the discretion of a trial judge regarding who might qualify as an expert in real property valuation. *See* Va. Code Ann. § 54.1-2010(B) (2009)

(stating that nothing contained in the code sections regulating professional real estate appraisers "shall proscribe the powers of a judge to determine who may qualify as an expert witness to testify in any legal proceeding.").

Second, the Virginia law with regard to the admission of expert testimony is not binding on this court. "Unlike evidentiary rules concerning burdens of proof or presumptions, the admissibility of expert testimony in federal court sitting in the diversity jurisdiction is controlled by federal law. State law, whatever it may be, is irrelevant." *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 476 (4th Cir. 2005) (quoting *Cavallo v. Star Enter.*, 100 F.3d 1150, 1157 (4th Cir. 1996)). My evaluation of an individual's qualifications as an expert, therefore, is governed by the factors outlined in Rule 702 and the exercise of sound discretion.

Given the proposed expert's background in the industry, as well as his appraisal experience, I find that he has the requisite knowledge, skill, experience and education to provide an expert opinion, so long as his testimony meets the other requirements outlined in Rule 702 and *Daubert*. The defendants argue that Daugherty's testimony regarding the values of the coal property[10] does not meet this standard. I agree.

---

[10] Daugherty's report identifies these properties as "Mill Creek #1," "Mill Creek #1A," "Tarpon Stone Quarry," and "Big Ridge." (Report 14.) Daugherty provided a distinct valuation for the coal reserves represented by each of these assets. I address them collectively because the same objections apply to the methodology used in valuing each lease.

Daugherty's expert report provides specific estimates of the dollar values of the coal reserves available at each of four sites. Although it has become clear that the assets Metamining acquired with Barnette Energy did not include the right to mine all of this coal, the plaintiff apparently seeks to introduce this testimony as evidence of the value of the property it believed it was acquiring in its transaction with the defendants.

The defendants object to Daugherty's failure to adequately explain the procedure he used to reach his opinions. In his report, Daugherty repeatedly describes his methodology as the "income approach."[11] He noted that he did not use a comparable sales or market approach[12] to valuing these properties because "each property is so unique that a direct comparable is usually not obtainable." (Report 15.) Daugherty reached his conclusions by applying factors he described as a "lease premium," and "permit value"[13] to the estimated reserve tonnages[14] at

---

[11] This approach is frequently used in appraising properties that are expected to generate an income stream. *See* John B. Corgel, et al., *Real Estate Perspectives: An Introduction to Real Estate*, *Valuation by the Income Approach* 321 (4th ed. 2000), *available at* http://www.mhhe.com/business/finance/corgel4e/.

[12] In this approach, an appraiser compares the asset or property to recent sales of similar assets in order to arrive at an estimate of the most probable selling price — or current value — of the asset he is appraising. (Report 8.)

[13] In his deposition testimony, Daugherty defined the "lease premium," which he put at $1.00 for all of the properties, as representing "just the value of owning the lease itself." (Daugherty Dep. 38.) Daugherty stated that he added this factor into his analysis because leases on good reserves of coal are difficult to acquire and have inherent value that should be accounted for in his calculations. Similarly, Daugherty stated that the

each lease site.  He also applied a discount factor to each valuation, which he described as necessary to account for the inherent economic risks of mining at each site.  Daugherty stated that he derived the "lease premium," "permit value" and discount factor for each lease by considering nine variables[15] relevant to the value of these assets, as well as his intuition, personal experience and expertise derived from his "years of appraising mineral assets." *Id.*  Although each of these values is represented as a discrete number in his expert report, Daugherty offered no explanation or formula for how he arrived at these specific numbers.  He also did not disclose a formula for calculating the discount rate to be applied to the income stream associated with each lease, other than noting that he applied a higher discount value to a lease he perceived as a higher risk in order to offset the inherent dangers associated with that mine.

---

"permit value," which he calculated at from fifty cents to $1.25, represented the increased value associated with reserves for which Barnette Energy already had permits, in contrast to reserves that were not yet permitted.  (Daugherty Dep. 39-40.)  But he never explained how he translated the "lease premium" and "permit value" figures, arrived at by his intuition, into the final dollar evaluation by simply multiplying these numbers by the estimated reserve tonnage.

[14]  Daugherty relied completely on the coal reserve numbers set forth in the Reserve Estimate prepared by Barnette Energy's mining engineer, in determining the value of the properties.

[15] These variables were: (1) royalty rate, (2) coal seam characteristics and seam thickness, (3) coal quality, (4) selling price, (5) status of metallurgical market, (6) rate of mining, (7) permitted and non-permitted reserves, (8) difficulty of leasing comparable reserves, and (9) proximity to loadout facilities and buyer.

I agree with the defendants that Daugherty's methodology does not satisfy the requirements of Rule 702 and *Daubert*. The plaintiff has failed to put forth evidence that would allow the court to conclude that Daugherty's valuations were the product of reliable principles and methods. He cites no formula by which he derived the lease premiums, permit values or discount factors that were essential to his conclusions. He recited a number of variables he considered in determining what these premiums should be, but both the court and the defendants are left to wonder how Daugherty conjured the precise figures he applied. Daugherty openly stated that he utilized intuition in reaching his conclusions, and he noted that he relied on a variety of assumptions and some information that is "extremely sketchy." (Report 23.) The court thus has no opportunity to compare his methods to those employed by other experts in the field.

Moreover, although Daugherty invokes the income approach — a process that does have wide acceptance among experts for valuing assets — the methodology he appears to have applied did not focus purely on future streams of income. For example, Daugherty stated in the addendum to his expert report that his approach to deriving the "lease premium" and "permit values" is related to the "cost approach," another method for valuing property that measures the amount of money that would be required to replace an asset. (Addendum 2.) Daugherty emphasized that he derived these premiums and values based on empirical data and

comparisons to prior similar transactions, but he does not explain what that empirical data was or how these other transactions are relevant to an income-based approach to valuation.

Daugherty's deposition testimony failed to clarify these issues. In response to a question about how his evaluation of the lease premiums could be verified, Daugherty described it as a "judgment factor . . . based on 50 years of experience." (Daugherty Dep. 40.) Daugherty made the same representation about the permit values utilized in his report. (*Id*. at 41.) Daugherty was repeatedly asked to identify the income stream or data he used in applying the income approach to reach his conclusions, and he responded that "it would be the cost on a discount basis that an operator would pay for this reserve." (*Id.* at 45.) Daugherty confirmed that no income data pertinent to Barnette Energy was incorporated into his analysis.

The proponent of expert testimony cannot simply invoke the name of an accepted methodology without explaining how the expert's approach fits within that methodology. I find that the plaintiff has failed to show its expert's testimony with regard to the value of these four coal reserve leases is the product of reliable principles and methods, and therefore has failed to establish its admissibility under Rule 702.

In his report, Daugherty rendered opinions regarding two other issues, as well. First, Daugherty evaluated the costs of reclamation in which Barnette Energy found itself obligated to engage shortly after the consummation of the sale. He reviewed Barnette Energy's production tonnages both before and after the sale and compared those production amounts to the company's reclamation costs following the sale. Daugherty concluded that Barnette Energy's post-sale reclamation costs per ton of post-sale coal production were so high as to support the conclusion that some of that reclamation was necessitated by mining activities that occurred before the sale.

The defendants object to the introduction of this testimony on two grounds, neither of which I find compelling. They first argued that this information is not relevant to any claim that remains in issue. Given my decision regarding the parties' motions for summary judgment, however, this information is relevant to the plaintiff's claim for breach of the defendants' warranty that Barnette Energy had no liabilities at the time of sale, which remains in dispute.

The defendants also argue that Daugherty's opinion with regard to these reclamation costs is based on insufficient facts and data to satisfy Rule 702 and *Daubert*. In reaching his conclusion, Daugherty simply compared the average cost of Barnette Energy's reclamation per ton of post-sale coal mined with the average cost if the quantities mined both before and after the sale were included. The

defendants appear to object primarily to the simplicity of this arithmetic. I find, however, that Daugherty's conclusion is the product of reliable principles and is based on sufficient facts and data. The defendants further contend that Daugherty improperly assumed that the plaintiff was truthful in representing that these reclamation obligations made it impossible for Barnette Energy to engage in additional post-sale mining — which, had it done so, would have lowered the cost of reclamation per ton of production and weakened Daugherty's opinion. This objection, however, does not undermine the accuracy of the data Daugherty considered in reaching his conclusion, and the defendants may cross-examine him at trial on this issue.

Finally, Daugherty appraised a number of pieces of mining equipment that were included in the transaction between the parties. The defendants have not objected to Daugherty's opinions in this regard, and I find that they satisfy the standards for admissibility under Federal Rule of Evidence 702.

VI. Summary.

For the reasons stated, it is **ORDERED** as follows:

1. Defendants' Motion to Strike Addendum to Report of Plaintiff's Expert Witness Roger Daugherty (ECF No. 104) is WITHDRAWN;

2. Defendants' Motion to Strike Plaintiff's Fourth and Fifth Supplemental Initial Disclosures (ECF No. 106) is GRANTED IN PART AND

DENIED IN PART. Thomas Shilling and Roger Viers will not be permitted as witnesses. All other witnesses objected to in the motion will be permitted;

3. Metamining's Motion for Partial Summary Judgment (ECF No. 108) is DENIED;

4. Defendant's Objections to the Testimony of Plaintiff's Designated Expert Witness Roger Daugherty (ECF No. 111) is GRANTED IN PART AND DENIED IN PART. Witness Daugherty will be permitted to testify as to his opinions as to Barnette Energy's costs of reclamation. He will not be permitted to testify as to his opinions as to the values of the purported coal reserves involved in the case;

5. Defendant's Motion for Partial Summary Judgment (ECF No. 113) is GRANTED IN PART AND DENIED IN PART. It is granted as to any claim of fraud relating to the so-called Raising Kane lease, as to any contractual claim for compensatory damages relating to such lease, as to any fraud claim against Arlene Barnette and as to any claims against Barnette Construction, Inc. It is otherwise denied; and

6. Plaintiff's Motion to Strike Portions of David Barnette's Affidavit and Austin Barnette's Affidavit (ECF No. 133) is DENIED.

ENTER: June 26, 2013

/s/ James P. Jones
United States District Judge